UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:04CR521 SNL |
| | ) | (FRB) |
| JOSE FLORES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM,
REPORT AND RECOMMENDATION
<u>OF UNITED STATES MAGISTRATE JUDGE</u>**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

<u>Defendant's Motion to Quash Arrest and Suppress Evidence</u> (Docket No. 35)

Testimony and evidence was heard on the defendant's motion on April 8, 2005, and April 13, 2005. Oral argument was heard as well. From the testimony and evidence adduced at the hearings the undersigned makes the following findings of fact and conclusions of law:

<u>Findings of Fact</u>

On August 22, 2004, Sheriff Don Blankenship and Deputy Carmelo Crivello of the Phelps County, Missouri, Sheriff's Department were on duty working in the vicinity of the Sugar Tree Road exit of Interstate Highway 44 in Phelps County, Missouri.

Sheriff Blankenship was driving a marked police car and Deputy Crivello was riding as a passenger. Also in the car was "Nitro", a trained drug detection dog. Sheriff Blankenship was trained as the dog's handler. As a part of their duties that day the officers had placed signs along Interstate 44 which indicated that a drug enforcement checkpoint was being conducted ahead with drug dogs in use. These signs were placed on the eastbound lanes of the highway shortly before the Sugar Tree Road exit ramp. These signs were apparently placed as a ruse in the hope and belief by the Sheriff's Department that persons driving east on Interstate 44 who had drugs in their possession would get off of the highway at the Sugar Tree Road exit in an effort to avoid being stopped and found in possession of drugs at the imagined upcoming drug checkpoint.

At about noon on that date the officers were parked in a parking area on the north side of Interstate 44 at the Sugar Tree exit. From that area they were able to observe vehicles that exited eastbound Interstate 44 at that exit. The officers saw a maroon sport utility vehicle (SUV) exit the highway. The SUV slowed, but did not stop completely, and rolled through the stop sign located at the end of the exit ramp. The SUV then turned right and began traveling south on County Road 7300. After observing this traffic violation Sheriff Blankenship and Deputy Crivello pursued the SUV and stopped it using the emergency flashing lights on the police car. The traffic stop took place at about 12:42 p.m.

After the SUV was stopped Deputy Crivello approached and spoke with the driver who later identified himself as Jose De Leon.[1]  There was an individual seated in the front passenger seat of the SUV.  Deputy Crivello told the driver that he had been stopped because he had failed to stop at the stop sign at the end of the exit ramp.  The driver told Deputy Crivello that there was no stop sign at that location and that he had committed no such violation.  Deputy Crivello told the driver that he did not intend to argue with the driver about the matter and that after the traffic stop was concluded the driver could return to the location to verify that there was in fact a stop sign at the location.

Deputy Crivello then asked the driver to produce his driver's license and registration papers for the vehicle.  The driver produced an Illinois driver's license bearing the name Jose De Leon and registration documents for the vehicle bearing the same name.  Deputy Crivello then asked the driver why he had exited at that location and the driver replied in vulgar terms that he exited because he had to urinate. Deputy Crivello noted that the driver's demeanor appeared to be angry and combative.  He noted that the driver was staring at him.  In Deputy Crivello's experience this was unusual for someone who had merely been stopped for a traffic violation.  Deputy Crivello was concerned that the driver "might want to fight."  Deputy Crivello asked the driver the purpose and

---

[1] Later it was determined that the driver's true name was Jose Flores.  He is the defendant here.

destination of his travel.  The driver replied that he had driven to Texas with his mother, dropped her off there, picked up his nephew and was driving back to Chicago.

Deputy Crivello then went and spoke to the passenger in the vehicle and asked him to produce identification, which he did. Deputy Crivello then asked the passenger why the SUV had exited the highway at this location and the passenger said that they had gotten off the highway because Joel wanted to get something to eat. Deputy Crivello asked the passenger about the purpose and destination of their travel.  The passenger reported that the driver had driven to Texas where he had dropped off his father, picked up the passenger and they were traveling back to Chicago.

Deputy Crivello then gave the identification and registration papers to Sheriff Blankenship and asked him to run license and record checks on them.  Deputy Crivello also expressed to Sheriff Blankenship his concern that the driver "might want to fight" and at some point Sheriff Blankenship radioed for another officer to come to the scene.  Sheriff Blankenship using his car radio then asked the dispatcher to run record and criminal history checks on the driver and passenger.

While this was being done Deputy Crivello then spoke again with the driver, asking him whether there was anything illegal in the SUV.  The driver did not reply.  Deputy Crivello then told the driver that he was going to have the drug dog "run around" the vehicle.  Again, the driver did not respond.

Deputy Crivello then asked Sheriff Blankenship to have the drug detection dog sniff the SUV. Sheriff Blankenship took the dog out of the police car and walked around the SUV with the dog. When the dog reached the left rear wheel well and taillight area it began barking and sat down which was a positive alert signal to the odor of drugs. All of this took place within a few minutes of the initial stop and before the license and records checks had been completed.

Deputy Crivello then began a search of the rear cargo area of the SUV. In doing so he noticed the odor of fresh glue. He pulled back the carpet and could see that there were weld marks on the floor area. He looked under the vehicle and could see that paint had been oversprayed on the underpanel. From the difference in space between the floor and underpanel areas it appeared to Deputy Crivello that there was a false compartment under the rear cargo floor area. He then pried open the rear cargo floor area and found a number of brick shaped objects wrapped in duct tape and vacuum sealed packaging. He opened one of the packages and found it to contain a firearm. He punctured one of the other packages and found it to contain a white powder substance which he believed to be cocaine.

The occupants of the vehicle were then placed under arrest. The vehicle was then towed to the Sheriff's office where a more thorough search was conducted. An additional package was found which contained a second firearm and additional packages of

cocaine were found and seized. A quantity of currency was found in the dashboard behind the glove compartment and was seized. The defendant was issued a citation for the stop sign violation. (See Government's Exhibit 1).

At the motion hearing the defendant attempted to impeach the testimony of Deputy Crivello by showing discrepancies between Officer Crivello's testimony concerning the timing and sequence of various events during and following the traffic stop and the timing and sequence of those various occurrences as shown in various written records and radio dispatches. (Defendant's Exhibits A-E, Government's Exhibit 1.)[2] Deputy Crivello offered explanations for the various discrepancies or noted that they appeared to be erroneous notations according to his own recollection. Having had the opportunity to hear the testimony of the witness, to observe his demeanor while testifying and upon consideration of those things which might detract from his testimony, the undersigned finds the testimony of Deputy Crivello to be credible in all significant respects.

Sheriff Blankenship has received training as a drug detection canine handler and has acted as such a handler for thirteen years. He has worked with several different dogs over

---

[2] Defendant's Exhibits A-E and Government's Exhibits 1 and 2 were identified and used at the hearing to examine and cross-examine witnesses. Defendant's Exhibits A, D and E, as well as Government's Exhibits 1 and 2 were submitted to the court following the hearing. Defendant's Exhibits B and C were not submitted to the court.

that period.  At the time of the matter giving rise to this prosecution Sheriff Blankenship was acting as a handler for canine detection dog Nitro.  Sheriff Blankenship purchased Nitro in 2000 from Law Enforcement and Detection K-9 Training Center, a private company located in Arkansas.  Nitro had undergone sixty hours of training at the company and Sheriff Blankenship trained with Nitro at the facility for two weeks.  Nitro is trained to detect the odor of cocaine, marijuana, heroin and methamphetamine.  Sheriff Blankenship also served as an instructor on the staff of the company.  The company is no longer in business.  (See Government's Exhibit 2).  Sheriff Blankenship considers Nitro to be the most reliable of the various dogs with which he has worked.  Nitro has been used to detect drugs on hundreds of occasions since being put in service in 2000.  Sheriff Blankenship estimated Nitro as 90% accurate in his alerts, meaning that drugs had been discovered 90% of the time after Nitro has made a positive alert for the odor of drugs which he is trained to detect.  Sheriff Blankenship noted that on some occasions when the dog had alerted but no drugs were thereafter found, subjects when confronted with the alert stated that drugs had previously been in the location to which the dog had alerted but were no longer there.  Nitro does not alert on every occasion when he is allowed to sniff for the odor of drugs.  Sheriff Blankenship and Nitro have also assisted other law enforcement agencies in drug detection efforts.  Sheriff Blankenship conducts regular on-going on-the-job training with

Nitro, however, he does not keep written records concerning any of the on-going training. The undersigned finds Sheriff Blankenship's testimony on these matters to be credible and sufficient to show that Nitro is a trained and reliable drug detection canine.

At the motion hearing the defendant presented the testimony of James Beernik. Mr. Beernik is a former police officer who was trained and worked as a drug detection dog handler. He also served as a trainer of both drug detection dogs and handlers. For the past several years he has been self-employed as the owner and operator of a commercial business that trains dogs. Part of the business is devoted to training drug detection dogs and handlers for law enforcement agencies. Mr. Beernik offered his opinion that it is important to keep records concerning the training and retraining of any drug detection dog as a means of demonstrating the reliability of the dog. He also stated that he believed that a drug detection dog ought to be recertified on an annual basis. He testified that there was no industry wide standard concerning drug dog training and that standards varied among various agencies and private operations. He had never spoken with Sheriff Blankenship about the Sheriff's prior training or the training or retraining of Nitro other than listening to his testimony on the day of the motion hearing. There is no evidence that he had worked with or observed Nitro in any actual or training operation. He was unwilling to offer any opinion as to whether Nitro could be considered a reliable drug detection dog because

there were no records available for him to review as to training and retraining or certification of the dog.

The defendant also offered into evidence at the hearing a tract prepared in 1995 by a staff attorney of the Office of Chief Counsel of the Drug Enforcement Administration (DEA) entitled "A Guide to Canine Interdiction - Maximizing the Impact of Drug Scent Evidence." The article summarizes case law relating to searches and seizures utilizing drug detection dogs and makes certain suggestions, including suggestions concerning training, certification and retraining in order to, as the title of the article suggests, "maximize" efforts to ensure the admissibility of such evidence. (See Defendant's Exhibit D.)

Discussion

In his original Motion to Quash Arrest And Suppress Evidence and Memorandum in Support the defendant argued that the officers unlawfully expanded the scope of the traffic stop of the defendant when Sheriff Blankenship had the dog sniff the exterior of the car during the stop. The defendant argued that the purpose of the sniff was to detect drugs, a matter unrelated to the reason for the original stop, and that the sniff was an unlawful search absent some reasonable articulable suspicion that the occupants of the vehicle were engaged in such unlawful activity. This same argument was urged upon the Supreme Court and rejected in Illinois v. Caballes, ___ U.S. ___, 125 S.Ct. 835 (2005). The court in Caballes was asked to decide "Whether the Fourth Amendment requires

reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." Id. at 837.  The court answered the question in the negative, stating, "[T]he dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation.  Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Id. at 838. Thus the defendant's claim made in his original motion has no merit.[3]

On April 13, 2005, at oral argument on defendant's motion the defendant argued two additional grounds in support of his motion.  First, he argued that Deputy Crivello's testimony had been impeached and discredited to such a degree that the court should not accept as true his testimony that he had observed the defendant to commit a traffic violation by failing to come to a stop at the stop sign at the Sugar Creek Road Exit.  As noted earlier, the undersigned has found Deputy Crivello's testimony to be credible and this claim has no merit.

The defendant secondly argued that there was insufficient evidence to show that Nitro was a reliable drug detection dog and that his positive alert could not serve as a basis for the subsequent search of the vehicle.

---

[3]The defendant filed his motion and memorandum before the Supreme Court decision in Illinois v. Caballes was handed down.

The evidence adduced at the hearing shows that the defendant's vehicle was stopped after it was observed to commit a traffic violation, namely failing to stop at a stop sign. An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop the vehicle. United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004); Whren v. United States, 517 U.S. 806, 812-13 (1996). After stopping the vehicle Officer Crivello approached and asked the driver to produce his license and registration. He also asked the passenger for identification. He asked both individuals questions about the nature and purpose of their travel. During a lawful traffic stop an officer may ask to see the driver's license and registration papers for the vehicle. He may also ask questions of the driver concerning his destination and purpose. United States v. Linkous, 385 F.3d 716, 719 (8th Cir. 2002). He may also ask similar questions of any passengers. Id.; United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000). Thus, Officer Crivello's questioning of both occupants of the vehicle about such matters did not violate the Fourth Amendment.

When Officer Crivello questioned the occupants about the details of their travel they gave differing answers as to some of the details of the nature and purpose of their travel. They also gave different answers as to the reason that they had exited the highway at that location. These inconsistencies were certainly a factor which Officer Crivello could consider in determining to

expand the scope of the stop. If the responses of the detainees and other circumstances give rise to reasonable suspicions unrelated to the traffic stop, the officer may broaden his inquiry to satisfy those suspicions. United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995). The factors upon which the officer bases his suspicions must be viewed in their totality and in light of the officer's experience. United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994)(en banc), cert. denied, 514 U.S. 1113 (1995). See also United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003)(Inconsistent statements from driver and passenger grounds to expand scope of stop). Lastly, the driver appeared to be combative as he was questioned during the stop, which Officer Crivello found unusual for someone stopped merely for a traffic offense. Such behavior, along with other factors, can justifiably cause the suspicions of the officer to be raised. United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995).

As noted earlier in this discussion, officers may lawfully conduct a dog sniff search of the exterior of a vehicle during a lawful traffic stop. Illinois v. Caballes, supra. A positive alert by a trained drug detection dog during such a traffic stop sniff provides probable cause to believe drugs are in the vehicle and thus for a search of the vehicle. United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995); United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999).

The defendant argues that the evidence was insufficient to show that Nitro was a reliable drug detection dog because no records were produced from the facility at which he was trained, because Sheriff Blankenship does not keep specific records regarding Nitro's performance in the field or records concerning the on-the-job retraining that he conducts with Nitro, and because Nitro has not been recertified since his original training certificate was issued in 2000. The defendant contends that Mr. Beernik's testimony and the DEA tract show that because of the lack of written records concerning Nitro and Sheriff Blankenship's training, certification and retraining, there is insufficient evidence to conclude that Nitro is a sufficiently trained and reliable drug detection dog such that the positive alert by Nitro provided probable cause to undertake a search of the defendant's vehicle. A similar set of circumstances and argument were presented and made in United States v. Diaz, 25 F.3d 392 (6th Cir. 1994). In Diaz the government relied on the testimony of the dog's handler to establish the dog's reliability, with the handler describing the dog and handler's training as well as the dog's on-the-job performance results. The defendant presented the testimony of a former police officer who was, at the time of his testimony, engaged in the training of drug detection dogs and handlers who testified, as Mr. Beernik did here similarly, of various factors which might cause a dog to make a false positive alert. The defendant argued that the reliability of the dog was not shown

because there were no written records produced in court of the dog's training and performance. The court held that "While training and performance documentation would be useful in evaluating a dog's reliability, the testimony of [the dog's handler] sufficiently established the dog's reliability." Id. at 396. The court then went on to hold that the dog's positive alert provided probable cause to search the defendant's vehicle.

Sheriff Blankenship testified as to the details of his and Nitro's training. He also testified as to Nitro's extensive performance in the field. He testified that Nitro's success rate was approximately 90%, that is, drugs are found nine out of ten times when the dog makes a positive alert. He also noted that on some occasions when drugs have not been found after a positive alert, suspects have provided information as to why the odor of drugs might be detected by the dog even though no drugs were present. Sheriff Blankenship's testimony on these matter was credible. Further, Sheriff Blankenship's testimony was sufficient to establish the reliability of the alert by the dog. See United States v. Delaney, 52 F.3d 182, 188 (8th Cir. 1995)(Reliability of dog established when dog was certified, had successfully alerted to drugs 50 times in a three year period, and handler had received 76 hours of dog handling training); United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999)(To establish reliability need only show dog has been trained and certified, need not show detailed account of dog's track record or education); United States v. Maejia, 928

F.2d 810, 815 (8th Cir. 1991)(Reliability established when shown dog has been used in past with successful results). See also United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001)(Reliability shown even though dog not recently certified). The defendant argued that the above cited cases were inapposite because they involved the required showing of dog reliability in an affidavit in support of an application for a search warrant. However, the undersigned cannot conclude that the showing of dog reliability required to support a finding of probable cause to issue a search warrant is somehow lower than that required to support a finding of sufficient probable cause to justify an on scene warrantless search during a traffic stop. The same argument was advanced and found without merit in United States v. Williams, 69 F.3d 27, 28 (5th Cir. 1995). In Williams the court held that, a fortiori, the same showing of reliability applies to both search warrant affidavits and on site vehicle dog sniffs. Id.

To the extent that the defendant in his motion seeks to suppress any statements made by him to police or law enforcement officials, it is noted that there was no evidence presented at the motion hearing that the defendant made any post-arrest statements to any law enforcement officials. The only evidence adduced as to any statements made by the defendant were those statements made by the defendant to Officer Crivello after and during the traffic stop described above and prior to his arrest. Because the traffic stop of the defendant was lawful, the statements made by him are

admissible in evidence. <u>Berkemer v. McCarthy</u>, 468 U.S. 420 (1984).

<u>Conclusion</u>

For all of the foregoing reasons the defendant's Motion to Quash Arrest and Suppress Evidence should be denied.

<u>Government's Motion for a Pretrial Determination of the Admissibility Of Defendant's Statements Pursuant To Title 18, United States Code, Section 3501</u> (Docket No. 32)

For the reasons set out above the government's motion should be granted.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Quash Arrest and Suppress Evidence (Docket No. 35) be denied.

**IT IS FURTHER RECOMMENDED** that the Government's Motion for a Pretrial Determination of the Admissibility of Defendant's Statements Pursuant to Title 18, United States Code, Section 3501 (Docket No. 32) be granted.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

/s/ Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of May, 2005.